**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS/ST. JOHN**

| | |
|---|---|
| Travelers Casualty and Surety )<br>Company of America, )<br>Plaintiff )<br> )<br>v. )<br> )<br>Donoe Redevelopment Partners, LLC, )<br>Virgin Islands Housing Authority, )<br>Popular, Inc., Banco Popular de Puerto Rico,)<br>Hunt Capital Partners, LLC, )<br>HCP-ILP, LLC, Donoe MM, LLC, )<br>VI Donoe, Inc., Pennrose Holdings, LLC, )<br>and Pennrose PHL, LLC )<br>Defendants ) | Civil Action No. _____ |

## COMPLAINT

COMES NOW Plaintiff, Travelers Casualty and Surety Company of America ("Travelers" or "Surety"), by and through its undersigned attorneys, and for its Complaint for Declaratory Relief against Defendants, Donoe Redevelopment Partners, LLC ("Donoe", "Owner" or "Obligee"), Virgin Islands Housing Authority ("VIHA"), Popular, Inc., Banco Popular de Puerto Rico, Hunt Capital Partners, LLC, HCP-ILP, LLC, Donoe MM, LLC, VI Donoe, Inc., Pennrose Holdings, LLC, Pennrose PHL, LLC (collectively, "Defendants") alleges as follows:

### I.    PARTIES AND JURISDICTION

1.    Travelers is a corporation organized and existing pursuant to the laws of the State of Connecticut, with its principal place of business at One Tower Square, Hartford, Connecticut.

2.    Donoe is a limited liability company comprised of three members, Pennrose Holdings, LLC, V.I. Housing Revitalization Corp. and Hunt Capital Partners, LLC.

3.    Pennrose, LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of Pennsylvania.

4.      Upon information and belief, none of the members of Pennrose, LLC are citizens of or domiciled in the State of Connecticut.

5.      VIHA is a semi-autonomous body politic and an agency of the United States Virgin Islands.

6.      Upon information and belief, Popular, Inc. is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business in Puerto Rico.

7.      Upon information and belief, Banco Popular de Puerto Rico is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business in Puerto Rico.

8.      Upon information and belief, Hunt Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Colorado.

9.      Upon information and belief, none of the members of Hunt Capital Partners, LLC are citizens of or domiciled in the State of Connecticut.

10.     Upon information and belief, HCP-ILP, LLC is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in the State of Colorado.

11.     Upon information and belief, none of the members of HCP-ILP, LLC are citizens of or domiciled in the State of Connecticut.

12.     Upon information and belief, Donoe MM, LLC is a limited liability company organized and existing under the laws of the United States Virgin Islands, with its principal place of business in the United States Virgin Islands.

13.     Upon information and belief, none of the members of Donoe MM, LLC are citizens of or domiciled in the State of Connecticut.

14.     Upon information and belief, VI Donoe, Inc. is a corporation incorporated in the State of Delaware, with its principal place of business in the United States Virgin Islands.

15.     Upon information and belief, Pennrose Holdings, LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of Pennsylvania.

16.     Upon information and belief, none of the members of Pennrose Holdings, LLC are citizens of or domiciled in the State of Connecticut.

17.     Upon information and belief, Pennrose PHL, LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of Pennsylvania.

18.     Upon information and belief, none of the members of Pennrose PHL, LLC are citizens of or domiciled in the State of Connecticut.

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

20.     Venue is proper in this Court under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the subject matter of this litigation occurred in this district.

## II.    FACTUAL ALLEGATIONS

### __The Project__

21.     On or about November 27, 2020, Owner and GEC entered into a construction agreement (the "Contract") under which GEC was to perform certain work on the construction

project known as Estate Donoe Redevelopment Project (the "Project") at Parcels 3B and 3B-1, Estate Donoe, New Quarter, St. Thomas, U.S. Virgin Islands, consisting of approximately 18 acres (the "Site"), which Site is owned in fee simple by the VIHA. The Project consisted of the construction of fourteen (14) muti-unit apartment buildings, a community center and gas-turbine and solar powered electrical microgrid.

22.     The Project Site is leased to and occupied and controlled by Owner, as Lessee from VIHA, pursuant to a 99-year "Ground Lease" between VIHA (as Landlord) and Owner (as Tenant) with such tenancy having commenced on November 30, 2020, and to expire on November 21, 2119.

23.     Applicable procurement regulations required that sealed bidding be utilized by the Owner as the methodology for soliciting construction projects with costs estimated above $250,000.

24.     Instead, in this case, the Owner solicited proposals for the Project through the issuance of a Request for Qualifications to approximately four general contractors, ultimately selecting GEC to enter into the Contract.

25.     The Request for Qualifications issued by Owner did not meet the applicable requirements of sealed bidding for soliciting construction projects with costs estimated above $250,000.

26.     In connection with the Project, Travelers, as surety issued Performance Bond number 107335824 ("Performance Bond") and Payment Bond number 107335824 ("Payment Bond") (the "Bonds") on behalf of GEC as principal for the benefit of Owner, as Obligee, on the industry standard AIA A-312 (2010) forms, each in the penal sum of the original Contract sum of $38,400,000 ("Contract Sum"), which Bonds incorporate the Contract by reference.

27.    Travelers, as surety, is entitled to rely on all defenses available to its principal, GEC in connection with the Project, Contract, and Bonds.

28.    In connection with the Project and the Bonds, Travelers issued a Dual Obligee Rider to the Bonds naming VIHA, Popular, Inc., Banco Popular de Puerto Rico, Hunt Capital Partners, LLC, HCP-ILP, LLC, Donoe MM, LLC, VI Donoe, Inc., Pennrose Holdings, LLC, and Pennrose PHL, LLC ("Additional Obligees") as additional obligees to the Bonds.

29.    Under the terms of the Dual Obligee Rider, the "Surety shall not be liable under the Bonds to the Primary Obligee, the Additional Obligee, or any of them, unless the Primary Obligee, the Additional Obligee, or any of them shall make payments to the Principal … strictly in accordance with the terms of said Contract as to payments and shall perform all other obligations to be performed under said Contract at the time and in the manner therein set forth.", and any rights of the Additional Obligees "are subject to the same defenses Principal and/or Surety have against the Primary Obligee."

## Site Background

30.    As more specifically alleged in the below paragraphs, the Owner by itself and through its member VIHA, possessed substantial and material knowledge regarding the environmental history and conditions of the Site.

31.    In 1994, VIHA requested permission to demolish the then-existing 300 dwelling units at the Site known as the Donoe Housing Community, which was owned by the Government of the Virgin Islands.

32.    Subject to compliance with the Environmental Protection Agency's ("EPA") asbestos and lead abatement requirements, through a Memorandum dated July 13, 1995 from the

Director of Public Housing, Caribbean Office, to Joseph Shuldiner, Assistant Secretary for Public

and Indian Housing, the VIHA demolition application of the 300 units on the Site was approved:

> An Environmental Assessment, as required by 24 C.F.R. Part 50, was performed
> by the Caribbean Office for the existing development. In this regard, while such
> review revealed no significant impact, *conditional approval was provided to
> ensure that any Asbestos Containing Material or Lead-Based Paint surfaces that
> may be present in the buildings follow applicable Environmental Protection
> Agency requirements prior to undertaking any demolition activities.*

(*emphasis added*).

33.    Subsequently, in 1999, VIHA received a HOPE VI grant from the United States

Department of Housing and Urban Development ("HUD") to fund the demolition of the Donoe

Housing Community at the Site. *See United States v. Starnes*, 583 F.3d 196, 202 (3d Cir. 2009)

("The Starnes Case").

34.    To effectuate the demolition work, VIHA issued a request for bids that required the

demolition work to be "performed in strict accordance with all federal, state and local regulations

and ordinances." *Id.* The request for bids also provided a copy of a report detailing the presence

of regulated asbestos containing material ("ACM") in the ceilings of 86 of the 88 structures at the

Site. *See id.*

35.    VIHA initially awarded a demolition contract to Alvin Williams Trucking and

Equipment Rental ("AWT"). *See id.*; *George v. Alvin Williams Trucking and Equipment Rental,
Inc.*, Civ. No. 607/2006, 2007 WL 9833362, at *1 (V.I. Super. 2007). AWT then subcontracted

asbestos and lead abatement work to Cleve-Allan George d/b/a Virgin Islands Asbestos Removal

Company ("VIARCO"). *See id.* VIARCO's bid indicated that it had "'joined forces' with

Environmental Contracting Company" ("ECC"), "a company run by [Dylan C.] Starnes." *See
Starnes*, 583 F.3d at 203.

6

36.     VIHA's work to remove the asbestos and lead started on January 10, 2001. *Id.*
George and Starnes:

> Instruct[ed] the work crew to use a "pressure washer" to dislodge asbestos-
> containing materials from the site's structures. This removal method, although
> time-efficient, generated a substantial amount of debris-filled wastewater, which
> the crew pumped into toilets and bathtubs. But those fixtures rapidly clogged,
> causing wastewater to pour out and accumulate on the buildings' balconies. In
> response, George constructed a drainage system out of PVC pipes, which permitted
> the wastewater to flow off the balconies and down to the ground. When the
> wastewater evaporated, it left a dusty white residue clinging to the facades of the
> buildings and the surrounding sidewalks and grass.

*Id.*

37.     In the Starnes Case, the Court found that an air-quality specialist with the Virgin
Islands Department of Planning and Natural Resources ("DPNR") visited the site "and observed
the deplorable conditions there, including liquid seeping from a trailer used to store asbestos-
containing material and unprotected workers covered in white powder.  He soon returned to the
site…and saw workers using shovels to remove chunks of dry asbestos-containing ceiling material
from apartments, causing visible emissions to emanate from the material."  Accordingly, the
DPNR issued a stop-work order, shutting down the project and referring it to the EPA. *Id.*

38.     As recognized by the DPNR, "asbestos poses serious health risks to individuals
who are exposed to high concentrations of fibers over a short period of time (acute exposure) or
lower levels over a longer period of time (chronic exposure). Studies link the inhalation of asbestos
fibers to an increased risk of fatal diseases such as asbestosis (scarring of the lungs that causes
increasingly labored breathing), mesothelioma (a cancer of the lining of the lungs and abdominal
cavity), and lung cancer. If asbestos-containing materials deteriorate or are not properly contained

7

during demolition or renovation activities, asbestos fibers can be released, become airborne and be inhaled into the lungs."[1]

39.    Also, in the Starnes Case, an EPA regional technical coordinator testified and the Court found that in February 2002 he had taken samples of suspected ACM from ceilings in one of the yet to be demolished buildings and that the evidence collected showed that the ceiling material contained between 4.1 and 6 percent asbestos. *See id.* At 204. This percentage of ACM is significant because it triggers VIHA and/or the Owner's notice requirements under OSHA to prospective employers, like GEC in this case, bidding on work at the Site until the ACM has been properly remediated and removed.   See id.; 29 CFR 1910.1001(b) (ACM means any material containing more than 1% asbestos); and 29 CFR § 1926.1101(k)(2)(ii)(A) (OSHA notice requirements to prospective employers). *See id.*

40.    As a result of the EPA's unit criminal investigation and as reflected by the outcome in the Starnes Case, both George and Starnes were convicted by the Jury of the 16-count criminal indictment for their actions at the Site. *See id.* At 203-205.

41.    Thereafter, and, in the aftermath of hurricanes Irma and Maria in 2017, a "large solar field" at an adjacent property "completely blew apart" and the broken solar panels believed to contain "lead, copper, chromium and cadmium" were "scattered over" the entirety of the Site. These materials are commonly referred to as "heavy metals" which in certain concentrations are known to have harmful effects on human health and "[i]f these metals are present it could cause a health risk to construction workers conducting earth work or work which put them in contact [sic] with the soil or for residents who later live at the site, especially children.[2]

---

[1] See DPNR letter to the VIHA dated August 9, 2021.
[2] *See* September 2020 Phase II Sampling and Remediation Plan ("September 2020 Sampling & Remediation Plan") prepared by Biompact, Inc. ("Bioimpact") and included in the Contract in Exhibit "K."

42.    In 2019, VIHA stated in a Brownfields Site-Specific Assessment Grant application: "The 18.3 acre Donoe site was developed as a dense public housing community in the 1960s. In 2002 the buildings were demolished in place and *lead paint and asbestos from the historic structures was remediated.* The planned redevelopment of the site was derailed due to litigation with the demolition contractor. Ultimately the concrete rubble was stored on site with plans to reuse a portion of it in the future redevelopment of the site. Presently, the site is vacant except for the stored concrete materials, and roadways left in place in the prior development." VIHA further stated that it "*is not responsible for contamination at the site.* The contamination occurred as a result of Hurricanes Irma and Maria...." VIHA, Application for Brownfields Site-Specific Assessment Grant, at TE-2 and at PSD-3 to 4 (emphasis added).

43.    In November 2020, Donoe further represented in an agreement between VIHA and Donoe concerning the use of federal funding pursuant to the Virgin Islands' Community Development Block Grant Disaster Recovery Funds ("CDBG-DR") that Donoe:

> is in compliance, in all material respects, with all provisions of the Federal Water Pollution Control Act, Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980, the Environmental Protection Act, the Resource Conservation and Recovery Act ("RCRA") and Solid Waste Disposal Act, and other similar federal, state and local statutory schemes imposing liability on [Donoe] relating to underground tanks and other storage facilities, or the generation, storage, impoundment, disposal, discharge, treatment, release, seepage, emission, transportation or destruction of any sewage, garbage, effluent, asbestos or asbestos-containing materials, polychlorinated biphenyls (PCBs), toxic, hazardous or radioactive materials, petroleum products, pesticides, smoke, dust, or any other form of pollution as such laws are in effect as of the date of this Agreement and with any rules, regulations and orders issued by any federal, state or local governmental body, agency or authority thereunder and with any orders or judgments of any courts of competent jurisdiction with respect thereto, and no assessment, notice of (primary or secondary) liability or notice of financial responsibility, or the amount thereof, or to impose civil penalties has been received by [Donoe].

9

CDBG-DR Program Loan Agreement by and between VIHA, as Lender, and Donoe, as Borrower, dated Nov. 30, 2020, at Para. 8.13.

44. Notwithstanding these prior representations regarding the remediation of asbestos and lead at the Site, the Owner and/or VIHA has not provided any evidence that the soils at the Site resultant from improper abatement of friable and non-friable asbestos containing materials was ever properly remediated from the Site.

### Owner's Obligations Relating to Hazardous Materials at the Site

45. At all relevant times it was the obligation of the Owner and/or the VIHA to ensure that the Site "be free of hazardous materials, contamination, toxic chemicals and gasses, and radioactive substances, where a hazard could affect the health and safety of occupants or conflict with the intended utilization of the property." 24 C.F.R. § 50.3(i)(1).

46. The Owner is required to comply with all applicable environmental laws and regulations, including CERCLA 42 U.S.C. § 9601 et seq. ("CERCLA") and OSHA 29 CFR § 1926.1101 ("OSHA").

47.    Under CERCLA, the term "owner or operator" means "in the case of an onshore facility, any person owning or operating such facility." 42 U.S.C. § 9601(20)(A). In this regard, VIHA and Owner are owners and/or operators of the Site as defined by CERCLA

48.    Under CERCLA, the term "facility" is defined as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include

any consumer product in consumer use or any vessel. 42 U.S.C. § 9601(9). Thus, the Site is a "facility" within the definition provided by CERCLA.

49.    Covered persons under CERCLA include the "owner and operator of a facility… from which there has been a release or threatened release which causes the incurrence of response costs, of a hazardous substances." 42 U.S.C. § 9607(a). Therefore, VIHA and Owner, as owners and operators of the Site, are covered persons under CERCLA and they are, therefore, strictly liable for the costs to respond to and remediate hazardous materials at the site.

50.    In accordance with OSHA notice requirements, the Owner was obligated to notify GEC—before execution of the Contract—of the ***presence and locations*** of all asbestos-containing materials and presumed asbestos-containing materials at the Site because GEC was a "prospective employer applying or bidding for work whose employees reasonably can be expected to work in or adjacent to areas containing" such asbestos-containing materials. (emphasis added) 29 CFR § 1926.1101(k)(2)(ii)(A). The Owner failed to comply with this obligation established by this applicable environmental law under the Contract.

## The Contract

51.    Contract Exhibit "M" Article 1.9.7 establishes an original Contract Sum.

52.    Contract Exhibit "M" Article 8.1.3 provides that "Contractor shall achieve Substantial Completion of all of the Work by the date that is 24 (twenty-four) months from the issuance of the Notice to Proceed." Based on the Notice to Proceed, therefore, the Contract contemplated that GEC would substantially complete the Contract by December 7, 2022, subject to the Owner's performance of its obligations under the Contract.

53.    Contract Exhibit "M" Article 8.3.1 provides that "[i]f the Contractor is delayed in the performance of the Work due to fires, floods, epidemics, pandemics, acts of Owner, or any

other cause beyond the reasonable control of Contractor, the Contract Times on the Project Schedule for performance shall be reasonably extended by Change Order."

54.    Contract Exhibit "M" Article 9.6.1 provides that "provided that the Application for Payment is received by Owner and the Architect no later than the first day of the month, the Owner shall make payment to Contractor no later than the final day of such month, provided that in all events, Owner shall use its best efforts to pay Contractor within 30 days after the Application for Payment is received, all subject to the availability of funds being made available to Owner by the Lenders."

55.    Contract Article 10.3.1 provides that if "Contractor encounters a hazardous material or substance not addressed in the Contract Documents and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and notify the Owner and Architect of the condition."

56.    Contract Article 10.3.2 provides that, "[u]pon receipt of the Contractor's notice [under Contract Article 10.3.1] the Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, *in the event such material is found to be present, to cause it to be rendered harmless*." (our emphasis)

57.    Contract Article 10.3.2 further provides that "[w]hen the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable additional costs of shutdown, delay, and start-up."

58.     The Project is financed with federal funds pursuant to the HUD Community Development Block Grant Disaster Recovery ("CDBG-DR") program.

59.     Based upon the Owner's representations regarding previous remediation of the Site, Contract Exhibit "K" provides that the "Contractor shall be responsible to mediate [sic] all hazardous materials, up to a maximum cost of $100,000.00, according to the following documents attached here to: "in the event any hazardous materials are encountered at the Site and the Contract required Owner to remediate all hazardous materials exceeding the maximum cost of $100,000.00 identified in this Exhibit "K."

60.     Prior to the execution of the Contract, the Owner retained Bioimpact as its environmental consultant and the Owner represented to GEC that Biompact was qualified and/or licensed to conduct the sampling contemplated in the September 2020 Sampling & Remediation Plan, which was made part of the Contract as Exhibit "K".

61.     The September 2020 Sampling Plan discloses the past existence of asbestos and lead contamination at the Site, but that "**remediation was completed, and a No Further Action letter reportedly was issued**", although as previously established no such letter has ever been produced by the Owner or VIHA.

62.     The September 2020 Sampling & Remediation Plan further mandates that the "site must be sampled for potential contaminants so that they may be remediated *prior to the construction of residential properties on this site*." (emphasis added).

63.     Contract Exhibit "K" also included a "DPNR letter to Amy Dempsey of Bioimpact, Inc. dated November 13, 2020 Re: Approval of Phase II Sampling and Remediation Plan for Parcels 3B and 3B-1 Estate Donoe, New Quarter, St. Thomas" ("DPNR Approval Letter of September 20 Sampling Plan").

13

64. The DPNR Approval Letter of September 20 Sampling Plan provides, among other items, the following: "Upon completion of items 1 through 10 above, to the satisfaction of the DPNR, including completion of proper disposal of any contaminated soil as approved by the DPNR-DEP, the DPNR shall issue a No Further Action letter to Donoe Redevelopment Partners, LLC."

65. Therefore, the Contract required the Owner to complete all sampling and remediation obligations and obtain the DPNR No Further Action letter for the entirety of Site "*prior* to the construction of residential properties" (emphasis added) on the Site.

66. In correspondence dated October 16, 2020 to GEC and the Virgin Islands Housing Finance Authority, VIHA stated "[a]s a part of the Master Development Agreement between VIHA and the developer, Pennrose, LLC, VIHA is required to deliver the site to Pennrose in a clean and buildable condition **before financial closing of the project**." (our emphasis)

*Hazardous Materials on the Site*

67. On November 6, 2020, Bioimpact prepared a status update to the September 2020 Sampling & Remediation Plan, which was never included in the Contract and was not provided to GEC or Travelers prior to Contract execution.

68. The November 6, 2020, status update reveals that "approximately 28% of the samples taken have elevated contaminants" and estimates that "the clearing of the site will take approximately 1 year."

69. GEC relied on the Contract, including the September 2020 Sampling & Remediation Plan incorporated into Contract Exhibit "K," in developing its schedule and projected cash flow for the Project.

70.     The Owner failed to disclose the November 6, 2020 status update to the September 2020 Sampling & Remediation Plan prior to Travelers issuance of the Bonds.

71.     GEC submitted its schedule and projected cash flow for the Project to Owner prior to entering into the Contract.

72.     On or about December 4, 2020, Owner issued GEC a Notice to Proceed with construction effective December 7, 2020.

73.     On or about December 7, 2020, GEC commenced work, which included Site clearing activities and, during the first phase of site clearing activities, GEC encountered broken solar panels, remnants of flooring and bathroom tiles from buildings previously located on the Site, construction debris, and abandoned automobiles, in addition to other debris. All of these debris are known and/or should have been known by the Owner to contain hazardous metals and asbestos, creating health risks for workers and future residents.

74.     On or about February 10, 2021, Bioimpact issued correspondence to the U.S. Virgin Islands Department of Planning and Natural Resources ("DPNR") stating that testing of soil samples did not reveal elevated levels of hydrocarbons or asbestos and that "[c]onstruction within the footprints of Building 1 and 2 may proceed."

75.     In February 2021, Bioimpact revised its sampling and remediation plan, stating again, in part, that "[t]he site must be sampled for potential contaminants so that they may be remediated prior to the construction of residential properties on this site."

76.     Contrary to the previous notice to proceed issued by the Owner and information provided to GEC regarding the purportedly cleared conditions of the Site, by letter dated March 7, 2021, Bioimpact informed the DPNR that various samples of on-Site debris and soils had revealed the presence of asbestos and other heavy metals ("Hazmat").

77.     At all times relevant, the presence of Hazmat required the preparation, submittal, and approval of debris disposal and soil remediation plans by the Owner.

78.     On or about March 8, 2021, in response to the March 7, 2021, Bioimpact report, DPNR, via email, directed that:

        a.      Owner submit an "Asbestos Abatement Plan"

        b.      "Pending approval of the Asbestos Abatement Plan, field activities should only take place in areas known to be asbestos-free (based on sampling results collected to date)."

        c.      "Known and/or suspected asbestos containing materials (ACM) areas should not be disturbed until the plan has been approved by DPNR."

79.     Based on the March 8, 2021 directives from the DPNR, the Owner started to issue a series of partial stop work directives to GEC relating to the testing for and remediation and disposal of Hazmat.

80.     Notwithstanding the March 8, 2021 directives from the DPNR, on or about March 9, 2021, Owner advised and instructed GEC that it should commence and/or continue construction activities for the Community Center and Residential Buildings 1- 4.

81.     On or about May 6, 2021, Owner advised and instructed GEC that it should commence construction activities for Residential Buildings 5 - 12.

82.     On or about May 7, 2021, and May 10, 2021, Bioimpact reported to DPNR and Owner that elevated levels of arsenic and barium, as well as asbestos had been found in soils within the Site, including soils in areas in which GEC had commenced construction activities and/or was shortly scheduled to commence construction activities.

83.    On or about May 10, 2021, Owner advised and instructed GEC not to proceed with construction activities beyond Residential Building 7.

84.    In contravention with Owner's Contract obligations, Biompact did not possess the required license to sample, test, evaluate and/or remediate asbestos.

85.    The Owner then engaged Hillman Consulting, LLC d/b/a Developer Assistance Company, LLC ("DAC") and Tysam Tech, LLC ("Tysam") to assist it with developing the abatement plans, as Bioimpact was not qualified to perform this task.

86.    On June 2, 2021, the VIHA submitted to the DPNR an "Asbestos Abatement Work Plan by Hillman Consulting" ("Hillmann Asbestos Abatement Plan").

87.    On August 9, 2021, the DPNR provided its comments to the Hillman Asbestos Abatement Plan indicating, among other items, that:

> It was disclosed by a previous report submitted to BioImpact, Inc. (4/14/21 report) and disclosed by the Client [Donoe Redevelopment Partners, LLC] that multiple soil samples contain asbestos fibers – analyzed by Transmission Electron Microscopy... This means either 1) moving directly to remediation of the soil (Step 6) or (2) Site-specific activity-based sampling (ABS) should occur (Step 5). (Framework at p. 10). It appears that neither has occurred... Also, soil areas at Donoe have been mulched. If there is any historical or current information indicating that the soil beneath the mulch may contain asbestos, the mulch should be removed... Regarding the asbestos floor tile and black mastic, a specific plan for abatement and disposal of friable and non-friable material needs to be submitted. The Plan only discusses options to abate the non-friable material.

88.    On November 24, 2021, Owner's consultant Tysam issued a Revised Management and Disposal Plan for Metal Contaminated Soils in Buildings 8-14 of the Project, including a timeline that "disposal of all metal contaminated soils" in these areas would be completed by December 31, 2021.

89.     Owner failed to complete Hazmat remediation by December 31, 2021, and yet the Owner continued to direct GEC to perform work on the Project with assurances that certain areas had been rendered harmless.

90.     Throughout 2021, GEC continued to place Owner on notice that the testing for and remediation and disposal of Hazmat was, in conjunction with other factors outside of GEC's control, delaying progress of the work on a day-by-day basis.

91.     On December 7, 2021, GEC submitted a Letter of Justification for requested Change Orders 2, 3, and 4 accounting for the increased costs of the delay to the Project in the total amount of $3,800,000; additional costs for design changes due to material shortages in the total amount of $1,200,000; and an extension of the Project completion date by 268 days.

92.     On December 8, 2021, the Owner and Architect executed Change Orders 2, 3, and 4, establishing a new Project Substantial Completion Date of August 31, 2023, and an agreement to compensate GEC $3,800,000 in damages for delays associated with Hazmat on the Project that Owner had misrepresented would be remediated by December 31, 2021.

93.     On December 29, 2021, the Owner's consultant Innova Services Corporation issued a letter to the VIHA agreeing with GEC's December 7, 2021, Letter of Justification, stating the "critical path of the project, that includes the structure of 1-7 and the excavation of buildings 8-14 have both been pushed on a day-to day-basis per GEC's letter. The continued excavation of buildings was halted upon the discovery of hazardous materials in the soil … Using the logic of the schedule provided in the contract, and assuming a 11/30/2021 resumption of work, I calculated the delay to be greater than the 286 [sic] calendar days claimed, so accepted GEC's calculation."

94.    The ongoing Hazmat testing and remediation by the Owner materially limited GEC's access to the Site and its ability to prosecute the work, including construction activities on the Project schedule's critical path.

95.    On May 11, 2022, the DPNR sent correspondence to the VIHA regarding its request for a "No Further Action (NFA) determination for Buildings 8&9- Donoe Redevelopment Project" ("DPNR NFA Letter for Buildings 8&9"). The DPNR NFA Letter for Buildings 8&9 provides "after review of the extensive reports analyzing the levels of asbestos and heavy metals contamination in the soils in the area of Buildings 8 and 9, the Department approves the NFA request to Continue Construction Work on Buildings 8 and 9", without consideration for the presence of hazardous materials still remaining at the Site.

96.    GEC continued to place Owner on notice of continued day-for-day delays due to Hazmat testing and remediation.

97.    On or about May 25, 2022, GEC received a series of maps prepared by Tysam dated May 19, 2022, now showing that the areas immediately surrounding the Community Center and Residential Buildings 1-4 were "areas still to be reviewed" for asbestos and that the areas immediately surrounding Residential Buildings 5-7 were "areas not cleared for NFA" for asbestos.

98.    In addition, the Tysam May 19, 2022, Hazmat Maps showed extensive areas of the Site in which there were suspected metal-contaminated soil locations, findings of elevated metal concentrations, and "staging areas" in which metal-contaminated soils were being collected for eventual off-Site disposition.

99.    At Owner's direction and in reliance upon Owner's repeated prior assurances that areas were remediated and cleared for construction, GEC and its personnel had for months been

unknowingly transiting and performing work in areas known and/or suspected by Owner to be contaminated with Hazmat.

100.     On May 25, 2022, GEC issued correspondence to Owner requesting a Change Order 5 to address outstanding issues, including a request for a 182-day extension of the Contract Substantial Completion date and additional costs incurred due to the continued delay since November 30, 2021.

101.     Despite the fact that the Owner knew that it was responsible for the Hazmat conditions on the Site and related delays, and clearly beyond the Contractor's control, the Owner proceeded to deny in full GEC's request for a 182-day extension of the Contract Substantial Completion date and additional costs incurred due to the continuing delay.

102.     Moreover, as of June 1, 2022, the Owner could not determine when Hazmat would be cleared and remediated at the Site to be rendered harmless as required under the Contract.

103.     Consequently, on June 10, 2022, GEC issued correspondence to Owner suspending its performance of work, among other items, due to ongoing nature of Hazmat remediation and disputes, including the failure of Owner to render harmless the Hazmat conditions at the Site, as reflected in Project meeting minutes.

104.     Contrary to the provisions of Article 10.3.2 that require, after the Hazmat has been rendered harmless, a written agreement between Owner and Contractor prior to resuming work, on June 13, 2022, Owner unilaterally and in contravention of the express conditions in the Contract issued correspondence directing GEC to continue performance pending the resolution of any disputes, notwithstanding the failure of Owner to in fact render harmless the Site due to Hazmat.

105.     On June 17, 2022, despite the continued presence of Hazmat and the potential threat to the health and safety of personnel on the Site, Owner again unilaterally and in breach of the

express conditions in the Contract issued correspondence to GEC again demanding "GEC commence and continue its Project work with diligence and promptness within a five-day period after this notice."

106.    Environmental/Hazmat meetings with Owner and its consultants had been occurring on a weekly basis, with GEC's participation, since October 2021. However, beginning June 22, 2022, GEC was dis-invited from all environmental/Hazmat related meetings with Owner and its consultants, and GEC's representative was instructed to leave environmental/Hazmat meetings occurring between Owner and its consultants.

107.    On June 24, 2022, GEC issued correspondence to Owner in which GEC re-stated that it was "demobilizing items to minimize standby costs and thereby mitigate Owner's damages while the Owner renders the site harmless from hazardous materials as required by the Contract." In this correspondence, GEC further affirmed that "[o]nce the Owner renders the site harmless for hazardous materials it is GEC's intention to come to a comprehensive written agreement between the Contractor and Owner, then resume Work."

108.    Contrary to the express terms of Article 10.3.1 of the Contract, on June 30, 2022, Owner issued correspondence to GEC, once again, rejecting GEC's entitlement to suspend performance of work based on the ongoing presence of Hazmat.

109.    On August 2, 2022, VIHA sent correspondence to DPNR requesting a "No Further Action (NFA) determination for Buildings 1-7- Donoe Redevelopment Project.", including a July 20, 2022 "Buildings 1-7 Clearance Report" submitted by Owner and prepared by Tysam.

110.    The July 20, 2022, Buildings 1-7 Clearance Report includes the results of metals testing indicating the detection of elevated levels of Arsenic "Between Buildings 4-5" and "Above Building 7", as of sampling performed on May 4, 2022.

111.    Remarkably, prior to May 4, 2022, Owner had directed GEC to perform work in the areas between Buildings 4-5 and above Building 7 and had represented to GEC that any Hazmat in these locations had been rendered harmless.

112.    On August 5, 2022, the DPNR sent correspondence to the VIHA regarding its request for a "No Further Action (NFA) determination for Buildings 1-7- Donoe Redevelopment Project" ("DPNR NFA Letter for Buildings 1-7"), without consideration for the presence of hazardous materials still remaining at the Site.

113.    The DPNR NFA Letter for Buildings 1-7 provides that after "a review of the submitted reports, attached to your letter, detailing testing and lab results of the area surrounding Buildings 1 thru 7, the Department approves the NFA request to Continue Construction Work on Buildings 1 thru 7 of the Donoe Redevelopment Project", without consideration for the presence of hazardous materials still remaining at the Site.

114.    Reflecting the continued presence hazardous materials at the Site, Hazmat testing and/or remediation has continued on the Project, at least, through October 17, 2022.

*Payment Delays*

115.    GEC submitted monthly payment applications to Owner in accordance with the terms of the Contract, which were certified by the Architect.

116.    Despite the Architect's certifications, during the performance of the work, the Owner consistently failed to timely pay GEC the amounts then due under GEC's payment applications in accordance with the terms of the Contract.

117.    For example, GEC submitted payment application No. 10 on August 4, 2021, the Architect certified it in full on August 5, 2021, and it was not until October 28, 2021, eighty-four (84) calendar days thereafter, that the Owner finally paid GEC for this work.

118.    GEC routinely placed Owner on notice of its delayed payments because, among other reasons, Owner's delayed payments was forcing GEC to expend its own capital to continue performance under the Contract.

119.    On or about April 16, 2022, GEC notified the Owner that GEC was due a total of "approved, but unpaid" invoices amounting to the material amount of approximately $2,983,163. GEC then submitted four additional payment applications after April 16, 2022, and before June 10, 2022, in the total net amount of $473,491.17.

120.    Within a period of almost sixty (60) calendar days (April 16, to June 10, 2022), the Owner only paid GEC a total of $257,174.07, related to GEC's Payment Application No. 18, from a total amount approved, due and owing of approximately $2,897,510.32, which, as of that date, said unpaid amount due to GEC constituted a material default by the Owner under the terms of the Contract and the Performance Bond.

121.    At the request of the Owner, on June 15, 2022, the Architect nullified its certification of payment application No. 4 in the amount of $1,832,500.00 and payment application No. 9 in the amount of $1,280,890.35. The foregoing amounts exclude the Owner's withholding of 10% retention and, as such, the total value decertified by the Architect on account of payments made to GEC under payment applications Nos. 4 & 9 was in the amount of $2,802,051.30.

122.    The Architect nullified its previous certification of payment applications Nos. 4 and 9, based on the Owner's contention that GEC had improperly handled its subcontractor payment process and had failed to provide requested documentation and explanation of such subcontractor payments, allegations that GEC had strongly disputed.

123.    In this regard, GEC has consistently maintained that payment applications Nos. 4 and 9 had been submitted in accordance with the terms of the Contract and that subsequent events

23

known to the Owner, including material shortages, design changes, and subcontractor documentation issues, affected GEC's payment of funds from payment applications Nos. 4 and 9 to subcontractors and receipt of the materials.

124.    Owner not only demanded that GEC repay the sums of the nullified payment applications 4 and 9, but also continue to withhold payments due GEC ***and*** ceased processing any additional GEC payment applications.

125.    To the extent, *arguendo*, that GEC failed to comply with the terms of its subcontracts and the Contract in the handling of subcontractor payments with respect to the funds paid under payment applications Nos. 4 and 9, Owner had already remedied any purported default by withholding funds from GEC in an amount in excess of the decertified payment applications and by further freezing any further payments to GEC for work performed under the Contract.

### Owner's Repudiation of the Contract

126.    As a precondition for the Owner's performance under the Contract, on or about September 21, 2022, the Owner submitted to GEC an "ultimatum" demanding immediate execution of an "Agreement for the Resumption and Completion of the Estate Donoe Redevelopment Project [Estate Tutu Phase I]" ("Resumption Agreement") that had been drafted by Owner.

127.    However, a cursory review of the Resumption Agreement clearly shows that this document was and is in material conflict with the terms of the Contract as then written. The execution of this document would have imposed on GEC substantial and material costs and risks to which GEC never consented under the terms of the Contract and that Travelers never contemplated to guarantee under the terms of the Performance Bond.

128.    By conditioning its own performance under the Contract and by demanding far-reaching prejudicial and onerous material changes to the Contract as then written, Owner repudiated the Contract in violation of its obligations under the Contract and in material breach thereof.

## Termination of the Contract

129.    On October 7, 2022, Owner issued correspondence to GEC terminating GEC for default pursuant to Sections 14.2.1 and 14.2.2 of the General Conditions to the Contract, Section 14.2.1 of Exhibit M of the Contract, and Sections 3 and 22 of Exhibit P of the Contract, and, on the same date, the Owner issued correspondence to Travelers notifying Travelers of Owner's termination of GEC for default and making a claim on the Performance Bond.

130.    Barely fourteen (14) calendar days after terminating the Contract and making the claim under the Performance Bond, on October 21, 2022, the Owner filed suit against GEC in the Superior Court of the Virgin Islands – Division of St. Thomas & St. John ("Owner-GEC Lawsuit").

131.    On January 13, 2023, GEC filed its answer in the Owner-GEC Lawsuit disputing the Owner's allegations, asserting a counterclaim against Owner for breach of the Contract, among other causes of actions, affirmative claims and remedies.

132.    Travelers's obligations under the Performance Bond, if any, arise only "if there is no Owner Default under the Construction Contract."

133.    An Owner Default is defined in the Performance Bond as "[f]ailure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract."

134. The existence of multiple Owner Defaults precludes any obligations by Travelers under the Performance Bond.

135. If there is no Owner Default, Travelers' obligations under the Performance Bond, if any, arise only if and "[w]hen the Owner has satisfied the conditions of Section 3" of the Performance Bond.

136. Section 3 of the Performance Bond provides, in part, that Travelers' obligations under the Performance Bond, if any, arise only after, "the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety."

137. A "Contractor Default" is defined in the Performance Bond as "[f]ailure of the Contractor, which has not been remedied or waived, to perform or otherwise comply with a material term of the Construction Contract."

138. According to the facts in this case, there has been no Contractor Default under the terms of the Performance Bond.

## COUNT I
### DECLARATION THAT TRAVELERS'S OBLIGATIONS UNDER THE PERFORMANCE BOND, IF ANY, HAVE BEEN DISCHARGED (OBLIGEE'S OMISSION OF MATERIAL FACTS)

139. Travelers restates and incorporates Paragraphs 1 through 138 above as if fully set forth herein.

140. Actual, continuing, and justiciable controversies exist between Travelers and Defendants regarding whether Travelers' obligations under the Performance Bond to Defendants have been discharged.

141. The Court can resolve the controversies in this case through entry of a judgment declaring the respective rights and obligations of Travelers, declaring the existence of an Owner Default and discharging Travelers' obligations, if any, under the Performance Bond.

142.    Prior to entering the Contract, Owner possessed extensive and material superior knowledge regarding the history of Hazmat at the Site.

143.    As established in this complaint, the Owner and its partner, VIHA, failed to disclose superior knowledge, engaged in a series of misrepresentations and/or omissions prior to and after Contract execution intended to minimize the risk that GEC and Travelers could have anticipated to encounter at the Site regarding the presence of Hazmat.

144.    The September 2020 Sampling & Remediation Plan in the Contract provided a very limited description of the true history and actual existence of asbestos, lead and heavy metals contamination at the Site, and expressly made clear that "remediation was completed, and a No Further Action letter reportedly was issued."

145.    According to the chronology of events described in this complaint, the Owner and the VIHA knew and/or should have known by operation of applicable environmental laws and regulations that the Site had not been fully or properly remediated prior to the execution of the Contract, regardless of whether a "No Further Action" letter had actually been issued and/or purportedly destroyed by the 2017 hurricanes. At all relevant times, the Owner and/or VIHA had an affirmative duty to disclose to GEC and Travelers the fact that the Site had not been fully or properly remediated prior to the execution of the Contract and issuance of the Bonds.

146.    Owner misrepresented the Site conditions in stating that "remediation was completed" and, instead, the Owner was obligated to inform GEC of all information that would have a material effect on GEC's schedule and price, as well as to Travelers prior to its issuance of the Bonds.

147.    Owner was also obligated to notify GEC – before the execution of the Contract – of the **presence and locations** of all asbestos-containing materials and presumed asbestos-containing materials at the Site.

148.    Owner knew or should have known that information regarding the actual Hazmat Site conditions would have a material effect on GEC's schedule and price, and Travelers' issuance of its Bonds.

149.    Owner failed to disclose material information regarding the actual Hazmat Site conditions that would have a material effect on GEC's schedule and price, and Travelers's issuance of its Bonds. Contract Exhibit "K" included Bioimpact's September 2020 Sampling & Remediation Plan, which was updated on November 6, 2020, but said "update" was never included in the Contract nor was it provided to Travelers and/or GEC prior to the issuance of the Bonds.

150.    The November 6, 2020, status update materially qualifies the relevant facts concerning real Hazmat in the Contract by revealing, for the first time, that "approximately 28% of the samples taken have elevated contaminants" and estimates that "the clearing of the site will take approximately 1 year".

151.    At all relevant times, the Owner and/or VIHA had an affirmative duty to provide to GEC and Travelers the November 6, 2020, status update to the September 2020 Sampling & Remediation Plan revealing the presence of elevated contaminants that could pose a risk of harm to GEC's personnel and all other persons traversing the site and the extended one-year duration to clear the Site of the hazardous materials.

152.    The percentage of samples reflecting elevated contaminants and the anticipated one-year duration of site clearing are material facts, not disclosed by Owner, that renders the disclosures in the Contract likely to mislead.

153.    GEC reasonably relied on Owner's representations regarding the absence of asbestos and lead as well as very minimal scope of potential Hazmat remediation work located at the Site in entering into the Contract for the Contract Sum and in developing the Project schedule.

154.    Travelers reasonably relied on Owner's representation regarding the scope-of-work and the construction duration in issuing the Bonds. Travelers would not have issued the Bonds had the Owner satisfied its duty to disclose that the Site had not been fully or properly remediated prior to the execution of the Contract and issuance of the Bonds.

WHEREFORE, and pursuant to 28 U.S.C. § 2201, as fully set forth its Complaint, Travelers prays for the following relief:

A.    For declaratory judgment finding that Owner made material omissions and misrepresentations regarding Hazmat, Travelers owes Defendants no obligations under the Bonds, any such obligations have been discharged, and the Bonds are exonerated.

B.    For attorneys' fees and costs incurred in pursuing this action under applicable law; and

C.    For such additional and further relief as the Court deems just and equitable.

## COUNT II
## DECLARATION THAT TRAVELERS'S OBLIGATIONS UNDER THE PERFORMANCE BOND, IF ANY, HAVE BEEN DISCHARGED (OBLIGEE'S FAILURE TO PROVIDE A SITE IN A CLEAN AND BUILDABLE CONDITION FOR CONSTRUCTION)

155.    Travelers restates and incorporates Paragraphs 1 through 138 above as if fully set forth herein.

156.    Actual, continuing and justiciable controversies exist between Travelers and Defendants regarding whether Travelers' obligations under the Performance Bond to Defendants have been discharged.

157.    The Court can resolve these controversies through entry of a judgment declaring the respective rights and obligations of Travelers declaring the existence of an Owner Default and discharging Travelers' obligations, if any, under the Performance Bond.

158.    Under the Contract, including HUD policy, Owner was obligated to provide GEC with a Site in a clean and buildable condition and free of Hazmat from the start of the Project.

159.    Owner also owed a common-law duty to GEC and GEC's employees to provide a safe workplace suitable for construction and free of Hazmat that could not endanger the health of those exposed to it.

160.    The Master Development Agreement between VIHA and Pennrose, LLC, as represented to GEC before the execution of the Contract, confirms the Owner's obligations to provide the Site in a clean and buildable condition before the commencement of the Project.

161.    The Contract required Owner to complete all sampling and remediation obligations and obtain the DPNR No Further Action letter "prior to the construction of residential properties" on the Site.

162.    Owner materially breached its obligations under the Contract by failing to furnish a Site in a clean and buildable condition and free of Hazmat.

163.    Owner amplified and failed to mitigate this breach and the adverse resulting consequences of such default by failing to properly and timely remediate and render harmless Hazmat encountered during the Project.

164.    Owner repeatedly breached the Contract by directing GEC to perform work on the Project prior to securing the DPNR "No Further Action" letter required under Exhibit K of the Contract.

165.    Owner repeatedly breached the Contract by directing GEC to perform work in areas that had not been rendered harmless or even been the subject of the applicable sampling and remediation plans, in violation of the express terms of the Contract.

166.    Owner unreasonably, improperly and negligently interpreted the sampling results to declare portions of the Project "clear" for construction despite such areas not having been rendered harmless, all of it in contravention to industry standards and best practices.

167.    In reliance on Owner's representations and against its best interest, GEC performed work in areas that had not been rendered harmless or even been subjected to the applicable sampling and remediation plans.

WHEREFORE, and pursuant to 28 U.S.C. § 2201, as fully set forth its Complaint, Travelers prays for the following relief:

A.    For declaratory judgment finding that Owner's failure to provide a Site in a clean and buildable condition and free of Hazmat, Travelers owes Defendants no obligations under the Bonds, any such obligations have been discharged, and the Bonds are exonerated.

B.    For attorneys' fees and costs incurred in pursuing this action under applicable law; and

C.    For such additional and further relief as the Court deems just and equitable.

### COUNT III
### DECLARATION THAT TRAVELERS'S OBLIGATIONS UNDER THE PERFORMANCE BOND, IF ANY, HAVE BEEN DISCHARGED (OBLIGEE'S FAILURE TO ADMINISTER THE CONTRACT AND PROJECT)

168.    Travelers restates and incorporates Paragraphs 1 through 138 above as if fully set forth herein.

169.    Actual, continuing, and justiciable controversies exist between Travelers and Defendants regarding whether Travelers' obligations under the Performance Bond to Defendants have been discharged.

170.    The Court can resolve these controversies through entry of a judgment declaring the respective rights and obligations of Travelers, declaring the existence of an Owner Default, and discharging Travelers' obligations, if any, under the Performance Bond.

171.    As more specifically identified below, the Owner committed multiple Owner Defaults in the correct administration of the Contract and Project.

172.    These Contract and Project administration Owner's Defaults include, but may not be limited to:

a.    Failure to pay undisputed sums due to GEC under the terms of the Contract.

b.    Failure to timely process and pay GEC's monthly Payment Applications.

c.    Failing to exercise best efforts to make timely payments to GEC.

d.    Wrongful denial of GEC's entitlement to additional Contract Time and Contract Sum.

e.    Denial and unreasonable restriction of site access due to the presence of Hazmat and associated testing and remediation efforts.

f.    Failure to coordinate and timely progress the remediation of Hazmat.

g.    Withholding information from GEC regarding Site conditions and the status of the remediation of Hazmat at the Site.

h.    Directing GEC to perform work at the Site while Hazmat had not been rendered harmless.

i.    Failure to render harmless the Site from Hazmat.

j.      Failure to comply with all applicable environmental laws and regulations, including CERCLA and OSHA.

k.      Failure to retain a licensed and qualified environmental consultant for the Project.

l.      Demand that GEC return to work at the Site in violation of the Contract terms.

m.      Failure to reach an agreement and issue appropriate change orders to GEC increasing the Contract price and extending the Contract time.

n.      Failure to perform and complete or comply with the material terms of the Contract as detailed herein.

WHEREFORE, and pursuant to 28 U.S.C. § 2201, as fully set forth its Complaint, Travelers prays for the following relief:

A.      For declaratory judgment finding that Owner's failure to administer the Contract is an Owner Default within the meaning of the Performance Bond, Travelers owes Defendants no obligations under the Bonds, any such obligations have been discharged, and the Bonds are exonerated.

B.      For attorneys' fees and costs incurred in pursuing this action under applicable law; and

C.      For such additional and further relief as the Court deems just and equitable.

## COUNT IV
## DECLARATION THAT TRAVELERS'S OBLIGATIONS UNDER THE PERFORMANCE BOND, IF ANY, HAVE BEEN DISCHARGED (OBLIGEE'S WRONGFUL TERMINATION OF PRINCIPAL)

173.      Travelers restates and incorporates Paragraphs 1 through 138 above as if fully set forth herein.

174.    Actual, continuing, and justiciable controversies exist between Travelers and Defendants regarding whether Travelers' obligations under the Performance Bond to Defendants have been discharged.

175.    The Court can resolve these controversies through entry of a judgment declaring the respective rights and obligations of Travelers, declaring the existence of Owner's Defaults, and discharging Travelers's obligations, if any, under the Performance Bond.

176.    Owner committed an Owner Default through its wrongful termination of GEC.

177.    Owner wrongfully terminated GEC without recognizing GEC's unequivocal contractual entitlement to suspend performance under the Contract.

178.    Owner wrongfully terminated GEC for failure to make progress without accounting for the Contract completion date and including GEC's entitlement to additional Contract Time.

179.    Owner's remaining purported bases for termination were either remedied prior to termination, were insufficiently material to justify termination, are factually inaccurate, and/or lack a basis under the Contract.

180.    There has been no Contractor Default under the terms of the Performance Bond.

WHEREFORE, and pursuant to 28 U.S.C. § 2201, as fully set forth its Complaint, Travelers prays for the following relief:

A.    For declaratory judgment finding that Owner's wrongful termination of GEC is an Owner Default within the meaning of the Performance Bond, Travelers owes Defendants no obligations under the Bonds, any such obligations have been discharged, and the Bonds are exonerated.

B.    For attorneys' fees and costs incurred in pursuing this action under applicable law; and

C.     For such additional and further relief as the Court deems just and equitable.

**COUNT V**
**DECLARATION THAT TRAVELERS'S OBLIGATIONS UNDER THE
PERFORMANCE BOND, IF ANY, HAVE BEEN DISCHARGED (REPUDIATION OF
CONTRACT)**

181.     Travelers restates and incorporates Paragraphs 1 through 138 above as if fully set forth herein.

182.     Actual, continuing and justiciable controversies exist between Travelers and Defendants regarding whether Travelers' obligations under the Performance Bond to Defendants have been discharged.

183.     The Court can resolve these controversies through entry of a judgment declaring the respective rights and obligations of Travelers, declaring the existence of an Owner Default, and discharging Travelers' obligations, if any, under the Performance Bond.

184.     Owner committed an Owner Default through its repudiation of the Contract.

185.     On or about September 21, 2022, Owner submitted to GEC an ultimatum demanding immediate execution of the Resumption Agreement that had been drafted by Owner.

186.     In such ultimatum, Owner conditioned its own performance under the Contract, as then written, on the immediate execution of the Resumption Agreement by GEC.

187.     The Resumption Agreement was and is in material conflict with the requirements of the Contract as then written. It would have imposed on GEC substantial and material costs and risks to which GEC never consented under the terms of the Contract and the Travelers did not agree to guarantee.

188.     By conditioning its own performance under the Contract and by demanding far-reaching and material changes to the Contract as then written, Owner repudiated the Contract in violation of its obligations under the Contract and in substantial breach thereof.

35

WHEREFORE, and pursuant to 28 U.S.C. § 2201, as fully set forth its Complaint, Travelers prays for the following relief:

A.     For declaratory judgment finding that Owner's repudiation of the Contract is an Owner Default within the meaning of the Performance Bond, Travelers owes Defendants no obligations under the Bonds, any such obligations have been discharged, and the Bonds are exonerated.

B.     For attorneys' fees and costs incurred in pursuing this action under applicable law; and

C.     For such additional and further relief as the Court deems just and equitable.

DATED February 23, 2023          By: _____

John K. Dema
V.I. Bar No. 357
Law Offices of John K. Dema, P.C.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5008
Phone: (340) 773-6142
E-mail: jdema@demalaw.com

*Attorneys for Travelers Casualty and Surety Company of America*